**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| Plaintiff, | : | Crim. No. 10-372(DRD) |
| | : | |
| v. | : | **O P I N I O N** |
| | : | |
| BRIAN M. CAMPBELL | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

Paul J. Fishman
United States Attorney
UNITED STATES ATTORNEY'S OFFICE
970 Broad Street
Newark, New Jersey 07102
By:    Anthony Moscato
        Assistant U.S. Attorney

        Keith Liddle
        Trial Attorney
        Department of Justice
        Attorney for the United States

Michael J. Rogers, Esq.
MCDONALD & ROGERS, LLC
181 West High Street
Somerville, NJ 08876
        Counsel for Defendant, Brian Campbell

**Debevoise, Senior United States District Judge**

On March 22, 2011, a jury convicted Defendant, Brian M. Campbell ("Campbell"), of

thirty-three counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 2.  The jury was unable to

reach a verdict on related counts of money laundering.

On April 5, 2011 Campbell moved for a judgment of acquittal pursuant to Fed. R. Crim.

P. 29(c) or, in the alternative, for a new trial pursuant to Fed. R. Crim. P. 33 on the grounds that

1) the Court improperly permitted government witnesses to testify about the observations of a

non-testifying individual's demeanor; 2) the jury did not follow the Court's instructions on the

law, as evidenced by alleged comments the jury foreman made to the news media after

conviction; 3) the Court erred by failing to require the jury to decide the loss amount; and 4) the

verdict was against the weight of the evidence.

A hearing was held upon the motion. The Court concludes that none of the grounds that

Campbell advances has merit, and the motion will be denied in its entirety.

## I. **Background**

The evidence, which was not contested, established that Pamrapo Bancorp., Inc., a

publically traded corporation owned Pamrapo Savings Bank, S.L.A. (the "Bank"), each of which

was governed by its own Board of Directors. William Campbell, Brian M. Campbell's father,

was the Bank's President. (William Campbell will be referred to by his full name in this opinion

to distinguish him from Defendant, Campbell).

Pamrapo Service Corporation (the "Service Corporation") was a wholly-owned

subsidiary of the Bank. However, it had its own Board of Directors. It provided securities and

investment services, such as the sale of stocks and bonds, mutual funds, annuities, various types

of insurance policies, and other money management services to its clients. Campbell was the

Managing Director of the Service Corporation.

On or about August 6, 2001, the Service Corporation entered into a contract with two

related companies, Prime Capital Services, Inc., ("Prime") and its sister company, Asset and

Financial Planning, Ltd. ("AFP"). According to this contract, the Service Corporation agreed to

2

"clear" securities transactions through Prime, a registered broker-dealer. Campbell, as agent of the Service Corporation, signed this contract. All customers that conducted securities transactions through the aforementioned business relationship belonged to the Service Corporation.

On or about August 7, 2001, Campbell executed a second contract with Prime and AFP, whereby he, as a Service Corporation employee, agreed to serve as a "registered representative" for Prime and to conduct securities transactions for the Service Corporation's customers through Prime. According to the terms of this contract, all fees and commissions generated through this arrangement were to be shared between Prime or AFP and the Service Corporation. The Service Corporation's share was to be paid directly to the Service Corporation. This policy was memorialized in every subsequent edition (2001, 2004, 2005 and 2006) of Service Corporation's Policy Statement.

## II. **The Scheme to Defraud**

Against this background, the government relies on evidence establishing the following facts to establish Campbell's scheme to defraud the Bank and the Service Corporation. In August 2006 the Service Corporation's Board of Directors changed Campbell's compensation. It required that all expenses of the Service Corporation be paid before Campbell received his share of the commissions. This resulted in a significant cut in Campbell's pay about which he complained vocally.

The government produced evidence of an early 2007 telephone conversation that Campbell had with Christopher Motta ("Motta"), an employee of Prime, in which Campbell stated that the Bank wanted to get out of the investment advisory service business (i.e., the AFP

3

portion of the Business and the most lucrative aspect of the business). Campbell further stated that the Bank wanted fees and Commissions paid directly to him.

In or around July 2007, Campbell attended a convention hosted by Prime in Colorado. According to the testimony of Ted Finkelstein ("Finkelstein"), General Counsel for Prime and AFP, Campbell told him that the Bank wanted to get out of the investment advisory services business and have fees and commissions paid directly to Campbell.

On or about May 30, 2007, Campbell sent a letter to Prime's President claiming that the Bank planned to separate from the investment advisory service business.  Upon questioning by his Secretary, Kathryn Carter ("Carter"), who had serious doubts about this representation and asked if the Bank's Chief Financial Officer knew about it, Campbell responded "they all know about it."  The Bank's Chief Financial Officer, Kenneth Walter ("Walter") (who was also Service Corporation's bookkeeper), the Chairman of the Bank's Board of Directors, Daniel Massarelli , and Herman Brockman ("Brockman"), a member of the Bank's Board of Directors, all testified that Campbell's statements in the letter were false and that the Bank never considered or decided to separate from the investment advisory services business or to have fees and commissions paid directly to Campbell, and that Campbell had no authority to speak on behalf of the Bank.

On or about July 23, 2007, Campbell had a conversation with Finkelstein, Prime and AFP's General Counsel, about the payment of the fees and commissions directly to him, as a result of which Finkelstein prepared and sent to Campbell a letter on Prime's letterhead addressed to Bank President William Campbell and to be signed by him.  The letter states, in part:

> This letter will confirm the terms for paying commissions to Brian

> Campbell under the Brokerage Lease and Networking Services
> Agreement dated August 6, 2001 between [Prime] and [the Service
> Corporation] . . . .
>
> All commissions for variable annuities and variable life insurance
> for non-residents of the State of New Jersey [Prime], and all
> investment advisory commissions generated from [AFP] shall be
> paid directly to [Campbell].  All other commissions will be paid to
> the [Service Corporation] pursuant to the [August 6, 2001
> contract].

Finkelstein testified that he addressed this letter to William Campbell at the behest of

Campbell.  Carter testified that she observed Campbell retrieve the letter at the Service

Corporation, walk up the stairs, and return with it bearing his father's signature.  Carter testified

that she again asked if Walter knew about this letter, and Campbell stated, "they all know about

it," or words to that effect.  Furthermore, Walter, Massarelli, and Brockman all testified that this

letter was neither presented to nor approved by the Bank's Board of Directors or the Service

Corporation's Board of Directors.  They each testified that William Campbell had no authority to

unilaterally sign that letter.

As a result of Campbell's representations to Prime and AFP, and, in particular, the letter

that William Campbell signed, Prime and AFP began issuing checks through the mail system

payable to Campbell.  The indictment lists 33 checks issued to Campbell from August 20, 2007

to April 3, 2009 totaling $571,000.00.

## II. <u>Discussion</u>

A. <u>Standards of Review</u>: Upon consideration of a motion for a judgment of acquittal the

test is whether, taking the evidence most favorable to the government, no rational jury could

accept the relevant evidence as sufficient to support a finding of the accused's guilt beyond a

reasonable doubt. United States v. Holland, 381 F. 3d 80, 88 (2nd Cir. 2004), cert. denied, 125 S.

Ct. 921 (2005).

The burden is on the defendant to demonstrate that a new trial should be granted "if the

interest of justice so requires." Fed. R. Crim. P. 33; see also United States v. McCourty, 562 F.

3d 458, 475 (2d Cir.) cert. denied, 130 S. Ct. 1012 (2009). District courts have wide discretion

under the new trial rule. United States v. Lincoln, 630 F. 2d 1313, 1319 (8th Cir. 1980).

However, they should grant motions for a new trial with caution. United States v. McClellon,

578 F. 3d 846, 857 (8th Cir. 2009), cert. denied, 130 S. Ct. 1106 (2010).

B. Testimony about Demeanor: In or about July 2008, Walter began to investigate

Campbell's finances. He discovered that Campbell was receiving and retaining the Prime and

AFP commission checks. In early September 2008, Walter and Robert Hughes ("Hughes"), a

consultant for the Bank, approached William Campbell in his office at the Bank and presented

this discovery. At the trial, over defense counsel's hearsay objections, the court permitted Walter

and Hughes to testify about their observations of William Campbell's demeanor after learning

that his son was receiving these checks directly. According to Walter, William Campbell

appeared "shocked" and, according to Hughes, he appeared "confused, agitated and disturbed."

Campbell contends that William Campbell intended this non verbal conduct to be an assertion

and thus was inadmissible hearsay.

Hearsay is an out of court "statement offered in evidence to prove the truth of the matter

asserted." Fed. R. Evid. 801(c). It can include "nonverbal conduct of a person if it is intended by

the person as an assertion." Fed. R. Evid. 801(a).

William Campbell could not have anticipated that he would be informed that his son had

6

been wrongfully taking the Prime and AFP checks that belonged to Service Corporation.  At the hearing, defense counsel was unable to articulate what statement the shock, suspense, and confusion was intended to convey, and, in view of the fact that this was all news to William Campbell, he had no opportunity to formulate any kind of a statement in response to this shocking disclosure.

Walter and Hughes did not testify to an out of court statement made by William Campbell. Rather, they testified to their observations of his physical appearance.  His spontaneous reaction to the disclosure does not constitute an intent to make an assertion.  As a result, it is not hearsay.

As part of the hearsay contention, Campbell relies upon a subsequent interchange between William Campbell and his son.  After William Campbell discovered that his son was receiving checks, Campbell was summoned to his father's office.  A heated argument developed between William Campbell and his son, where William Campbell stated, "Brian, this is wrong, you will pay the money back," or words to that effect.  Campbell eventually agreed and undertook to repay the money.  Thus Campbell can be deemed to have made William Campbell's statement that "this is wrong" as his own statement or adopted it.  Evid. Fed.R. 801(d)(2)(a) and (B).

Admission of testimony about William Campbell's demeanor upon learning of his son's conduct and his statement during his interchange with Campbell did not violate the hearsay rule and is not a ground for a new trial.

C.  <u>Post Verdict Juror Statement</u>: Campbell presents an article that appeared in the Jersey Journal daily newspaper the day after the jury returned its verdict which states, in pertinent part:

7

> Jury foreman, Dave Richards, 57, of West Milford, said after the trial that members of the jury all agreed that it was illegal for Campbell to take the money, but that there was some disagreement as to whether Campbell knew he was committing a crime or intended to deceive his employer.

Campbell argues that the jury charge explicitly instructed the jury that an element of the mail fraud offenses was that a defendant must act with the explicit intent to defraud, that there must be jury unanimity with regard to the elements of fraud, and this article demonstrates that the jury failed to comply with these instructions.

The Court notes that the jury foreman announced the verdict Count by Count and that each juror responded affirmatively when he or she was asked if he or she agreed with the verdict. The quoted article does not state that at the time of delivery of the verdict there was disagreement about intent. The more probable meaning of the foreman's statement is that while arriving at a verdict of guilty, there had at one time in the process been disagreement on that issue. That disagreement must have been resolved by the time the verdict was rendered.

Campbell seeks a hearing on this question, or, alternatively a new trial simply on a purported comment by the jury foreman as quoted in a daily newspaper. Such relief is expressly prohibited by Fed. R. Evid. 606(b):

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith.

A juror may, however, testify on the question whether extraneous information was improperly brought to the jury's attention or whether any outside influence was improperly

8

brought to bear upon any juror.  Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Campbell is not alleging that extraneous information was improperly brought to the jury's attention or that any outside influence was improperly brought to bear upon any juror.  There is no basis for the relief Campbell seeks.

D.  <u>Determination of Loss Amount</u>: the Indictment in each mail fraud Count alleges the dollar amount of the check that was the subject of that Count.  Campbell asserts that the Court erred in failing to require that the jury determine the loss amount.  The basis for this contention is that for sentencing purposes the authorized sentencing range is greatly dependent on the loss amount and, according to Campbell, a defendant is entitled to have a jury determine that issue.

Here, financial loss is not an element of the offense of conviction.  <u>See</u> 18 U.S.C. § 1341. <u>United States v. Booker</u>, 543 U.S. 220 (2005) does not require that the loss amount in this case be found by the jury.  It invalidated those provisions of the Sentencing Reform Act that make the Sentencing Guidelines mandatory, rendering them advisory.  A court during the sentencing process must calculate the advisory Guidelines range "'precisely as [it] would have before Booker.'" <u>United States v. Jackson</u>, 467 F. 3d 834, 837 (3d Cir. 2006).  When engaging in judicial fact finding, the standard is preponderance of the evidence.  <u>United States v. Cooper</u>, 437 F. 3d 324, 430 (3d Cir. 2006).  A jury verdict is not necessary for the computation of loss for sentencing purposes either for a determination of a defendant's Total Offense Level or for a determination of the amount of restitution that a defendant should pay.

It was not error to decline to require the jury to determine the loss occasioned by

Campbell's fraudulent acts.

    E. <u>Weight of the Evidence</u>: Campbell's defense rested primarily upon the July 25, 2007 letter rerouting the Prime and AFP commissions. It had been prepared by Finkelstein of Prime and AFP and countersigned by William Campbell who was President and CEO of both the Bank and Service Corporation. Campbell contended that he had a contractual right to rely on this letter and retain the proceeds of the checks he received. Campbell notes that the total control that William Campbell exercised over both the Bank and Service Corporation justified his belief that he was entitled to receive the commissions.

    The government did not call William Campbell as a witness and did not attempt to portray what role he actually was playing in these events other than signing the letter that Finkelstein wrote and Campbell put before him to sign. The government contended that William Campbell lacked the authority to sign the letter or to divert the commissions.

    The Court heard the testimony and saw the exhibits. Whatever the role of William Campbell may have been, there was powerful evidence that his son, Campbell, defrauded the Service Corporation and the Bank and was fully aware that he was doing so. There is much evidence to show that he knew that the July 25, 2007 letter that his father signed had no legal validity and was only a tool to convince Prime and AFP that they should comply with his unauthorized instructions that commissions should be paid directly to him. For example:

- Campbell took a significant pay cut that he considered was unjustified and that angered him greatly.

- Campbell made repeated false statements to Prime's and AFP's Motta and Finkelstein that the Bank had decided to separate itself from the

investment advisory services business.

- Campbell caused to be written and signed a letter falsely claiming that the Bank wanted to separate from the investment advisory services business and that the Bank wanted fees and commissions paid directly to him.

- Two days before writing the July 25, 2007 letter, Campbell told Finkelstein that he was "not sure if the Bank will sign off, because it requires a board meeting," thus demonstrating that Campbell knew that his father's direction alone was insufficient to alter the long standing commission payment arrangement.

- When questioned by his secretary, Carter, about the May 30, 2007 letter and the July 25, 2007 letter, Campbell lied to her, stating "everybody knew" about them.

- Campbell instructed Carter to not include the diverted checks on her monthly commission statements, telling her, in effect, they "don't need to see it, it will cause trouble." Thus he concealed from the Chief Financial Officer the embezzling of the funds.

- Campbell repeatedly lied to the Chief Financial Officer, who inquired about the drop in income. Campbell told him the drop in income was the result of the poor economy.

- Campbell showed the July 25, 2007 letter only to his father. That was when he obtained his father's signature, concealing it from the internal auditor after July 25, 2007.

11

- After Campbell was confronted with the diversion of the checks, he attempted to justify it, giving false reasons such as i) a meeting had occurred at which the arrangements had been approved, ii) the customers belonged to him, and iii) there were "liability and auditing" concerns.

- After Campbell's father told him that his conduct was wrong and that he would be required to repay the money, Campbell agreed to do so.

- Even after all these events had occurred, Campbell changed accounts so that he could continue to receive diverted money.

This evidence is totally inconsistent with, and rebuts Campbell's claim that he reasonably relied on the July 25, 2007 letter his father signed. The jury, by its verdict, rejected Campbell's explanation of his conduct. There was ample evidence to support the jury's verdict of guilty on the mail fraud counts, and it should not be disturbed.

## IV. Conclusion

For the reasons set forth above Campbell's motion for a judgment of acquittal or, in the alternative, for a new trial, will be denied. The Court will file an appropriate order.


May 12 , 2011

DICKINSON R. DEBEVOISE
U.S.S.D.J.

12

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA           :
                               :
    Plaintiff,   :          Crim. No. 10-372(DRD)
                               :
    v.           :          **O R D E R**
                               :
BRIAN M. CAMPBELL                  :
                               :
    Defendant.   :
_____:

    Defendant, Brian M. Campbell, having moved for a judgment of acquittal or, in the alternative, for a new trial, and the Court having considered the submissions of the parties and having heard oral argument, and for the reasons set forth in an opinion of even date;

    IT is this 12th day of May, 2011;

    **ORDERED** that Defendant's motions is denied in its entirety.


                             _____
                             DICKINSON R. DEBEVOISE
                             U.S.S.D.J.